IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| JAMES MCKENZIE, § | |
| Plaintiff, § | |
| § | |
| v. § | NO. 3:04-CV-2690-M |
| § | |
| JO ANNE BARNHART, § | |
| COMMISSIONER OF SOCIAL SECURITY, § | |
| § | |
| Defendant. § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to 28 U.S.C. §636(b) and the District Court's Order of Reference dated January 19, 2004, came on to be considered Plaintiff James McKenzie's action brought under 42 U.S.C. §405 (g) seeking judicial review of the Defendant's denial of Plaintiff's application for benefits under Title II of the Social Security Act, 42 U.S.C. § 423 and Title XVI of the Social Security Act 42 U.S.C. § 1381a.

Procedural History:

On September 12, 2002 McKenzie filed an application for Social Security benefits. (Administrative Record "Tr." at 89). He alleged disability due to "lower back pain and neck - bulging disc." (*Id.* at 93). At the time of the administrative hearing, Plaintiff also claimed to be disabled because of dizziness, coughing up blood, and loss of feeling in his left hand and leg. (*Id.* at 14).

An Administrative Law Judge ("ALJ") conducted a hearing on July 26, 2004. (Tr. 329). On August 19, 2004, the ALJ denied Plaintiff's request for disability benefits. (*Id.* at 9). In pertinent part, the ALJ found that Plaintiff had the severe impairments of cervical spondylosis

1

and post laminectomy syndrome. (*Id.* at 17 ¶ 3). The ALJ found that Plaintiff could not perform his past relevant work, but could perform substantially all of the full range of light work, and thus found the Plaintiff not disabled at step five. (*Id.* at 17-18).

McKenzie timely requested review of the ALJ's decision by the Appeals Council, and on October 22, 2004 the Appeals Council denied his request. (Tr. at 4). Therefore, the ALJ's decision became the Commissioner's final decision for purposes of judicial review.

Plaintiff filed his complaint on December 21, 2004 and his brief on May 9, 2005. Respondent filed her brief on July 1, 2005

<u>Standard of Review – Social Security</u>: In a Social Security Case, the scope of judicial review is limited to a determination of whether the ALJ's decision to deny benefits is (1) supported by substantial evidence and (2) whether the proper legal standard was applied. *E.g., Kinash v. Callahan*, 129 F.3d 736, 738 (5th Cir. 1997).

Substantial evidence means more than a scintilla, but less than preponderance. *E.g., Haywood v. Sullivan*, 888 F.2d 1463, 1466 (5th Cir. 1989). It is defined as relevant evidence that a reasonable mind would accept as sufficient to support a conclusion. *E.g., Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994)(citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971)).

In determining whether substantial evidence exists, the court does not reweigh the evidence, retry the issues, or substitute its own judgment. *E.g., Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994). The Commissioner's decision is granted great deference. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). Conflicts in evidence are resolved by the Commissioner, not the courts. *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir 1995). Accordingly, the absence of substantial evidence will be found only when there is a "conspicuous absence of creditable

choices" or "no contrary medical evidence." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Findings of fact which are supported by substantial evidence are conclusive. *Martinez*, 64 F.3d at 173.

Discussion: To prevail on a claim for disability benefits, a claimant must establish physical and/or mental impairment(s) lasting at least twelve months that prevent him from engaging in any substantial gainful activity. *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985)(citing 42 U.S.C. §§ 416(i)(1), 423 (d)(1)(A)). In determining whether a claimant can engage in substantial gainful activity, the Commissioner uses a five-step sequential inquiry. *E.g., Martinez,* 64 F.3d at 173-74. Under the first four steps, a claimant has the burden of proving disability, but under the fifth step, i.e. when a claimant is unable to perform his previous work, the burden shifts to the Commissioner to prove that there is other substantial gainful activity which he can perform. *E.g., Bowen v. Yuckert*, 482 U.S. 137, 147 n.5, 107 S.Ct. 2287, 2294 n.5 (1987); *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

As stated above, the ALJ determined that McKenzie was not disabled at step five of the determination. (*See* Tr. 18). In his brief Plaintiff contends that the ALJ's residual functional capacity ("RFC") determination was not based on substantial evidence and that the ALJ erred in failing to call a vocational expert at step five.

The documents contained in the administrative record reflect the following chronology of events and medical care:

McKenzie had back surgery in 1997. On or about April 15, 2002 he sustained an on the job injury. (Tr. 144). In the intervening period he sought medical care for pain and tenderness in the lumbar spinal region. He did not return to work following the work-related injury. After filing his application for Social Security benefits, he sustained additional injuries as a result of a

3

motor vehicle accident on October 19, 2003.

The record contains reports from the Erwin Chiropractic Clinic for the period between January 7, 2002 and January 13, 2003. (Tr. 156-248, Exh. 3F).[1] The records report seventy-two visits to the clinic during this period. The records reflect that McKenzie repeatedly complained of tenderness in his neck and back. They also document the treatment regimen which was followed consisting of manual traction, manipulation and electrical stimulation of his back, and individual and group therapy sessions which ameliorated his condition with varying degrees of success. The records of the Erwin Clinic do not show that any prescription or non-prescription medicines were ever recommended as part of Plaintiff's treatment regimen.

On May 23, 2002 Dr. Bobby C. Erwin, D.C. of the Erwin clinic filled out a Texas Workers' Compensation Work Status Report which indicated that the Plaintiff had been injured on April 15, 2002. It further indicated that McKenzie's injury had previously prevented him from working and would continue to prevent him from working until at least June 28, 2002. (Tr. 246). On the page immediately following, there is an identical report, with the dates changed to indicate inability to return to work from June 28, 2002 to July 28, 2002. (*Id.* at 247).

On June 10, 2002 the Plaintiff had a MRI of the lumbar spine. The impression by Darrell Hobson, D.C., D.A.C.B.R., was at L-2 a 5-6mm broad based posterocentral protrusion/herniation which moderately compressed the ventral surface of the thecal sac and terminal conus medullaris, with mild to moderate intervertebral osteochondrosis also present. At L-5 - S1 there was moderate intervertebral osteochondrosis with a broad based 4-5mm posterocentral protrusion/herniation which mildly compressed the ventral surface of the thecal sac and resulted

---

[1]These notes variously refer to the treating doctors as Windsor, Windors, and Winors. However, it is clear from other entries in the record that it is Dr. David C. Windsor, D.C. who is referred to in the notes. (*See, e.g.,* Tr. 243).

4

...

in bilateral neuroforaminal stenosis. This protrusion as well as bilateral facet joint disease moderately narrowed the central canal in the A to P dimension. At L4-5 there was mild intervertebral osteochondrosis with a 3-4mm broad based right paracentral/foraminal protrusion/herniation which narrowed the right exit neuroforamen, with a mildly narrowed central canal caused by bilateral facet joint disease and ligamentum flava hypertrophy. At L3-4 there was mild intervertebral osteochondrosis. (Tr. 241-42).

On June 28, 2002 the Plaintiff had a cervical spine MRI done. It was noted that he reported that he experienced neck pain and occasional hand numbness. The impression by Darrell Hobson, D.C., D.A.C.B.R., stated that at c3-4 there was mild to moderate intervertebral osteochondrosis[2] with a 4-5 mm hyperintense posterocentral protrusion/herniation which migrates superiorly behind the bottom half of the C3 vertebral body. This was associated with posterior osteophytic ridging, which moderately compressed the right anterolateral spinal cord and narrows the central spinal canal to 7 mm. Uncinate[3] process hypertrophy[4] resulted in a moderate neuroforaminal stenosis.[5] At C4-5 there was a mild intervertebral osteochondrosis associated with a 2-3 mm broad based right paracentral protrusion/herniation with posterior osteophytic ridging which moderately compressed the right anterolateral aspect of the spinal

---

[2]"[A] disease especially of children and young animals in which an ossification center especially in the epiphyses of long bones undergoes degeneration followed by calcification." Dictionary.com *at* http://dictionary.reference.com/search?q=osteochondrosis.

[3]"Bent at the end like a hook; unciform." Dictionary.com *at* http://dictionary.reference.com/search?q=Uncinate.

[4]"A nontumorous enlargement of an organ or a tissue as a result of an increase in the size rather than the number of constituent cells." Dictionary.com *at* http://dictionary.reference.com/search?q=hypertrophy.

[5]"A constriction or narrowing of a duct or passage." Dictionary.com *at* http://dictionary.reference.com/search?q=stenosis.

cord and narrowed the spinal canal to 8 mm.  Uncinate process hypertrophy moderately narrowed the right exit neuroforamen.  At C5-6 there was moderate intervertebral osteochondrosis with a broad based right paracentral protrusion/herniation associated with posterior osteophytic "riding[sic]" which severely compressed the right half of the spinal cord and reduced the right side of the central canal to 4mm.Uncinate process hypertrophy on the right moderately narrowed the right exit neuroforamen.  At C6-7 there was moderate intervertebral osteochondrosis with a 3-4 mm posterocentral protrusion/herniation with posterior osteophytic ridging which moderately compressed the ventral spinal cord and narrowed the central spinal canal to 5 mm.  The combination of the protrusion/herniation and uncinate process hypertrophy moderately narrowed the exit neuroformen bilaterally, although most pronounced on the left side.  Additionally, there was loss of the cervical lordosis.[6]  (Tr.  239-40).

    On July 29, 2002 Dr.  Erwin completed a status report indicating that Plaintiff would be unable to work from July 28, 2002 to August 28, 2002 and noted that he was scheduled for an "E.S.I." and a consultation with Dr.  Willis.  (Tr.248).  Dr.  Willis's evaluation on the same date noted that McKenzie was on no medications and that he was doing well with his then current regimen.  (*Id.*).

At the request of the Texas Rehabilitation Commission on August 17, 2002, Marvin Van Hal, M.D., performed an independent examination and evaluation of Plaintiff.  He found the presence of multilevel cervical spondylosis, exacerbated by a previous work injury; status post lumbar surgery with discogenic verses neurogenic type pain disorder.  He recommended that Plaintiff follow an excellent "McKenzie exercise" regimen, that he practice excellent back

---

[6]"Lordosis is an increased curvature of the normally curved lumbar spine." MedlinePlus *at* http://www.nlm.nih.gov/medlineplus/ency/article/003278.htm.

mechanics, and that he utilize anti-inflammatories. He opined that Plaintiff could return to work after three or four weeks of "McKenzie exercises" with minimum overhead lifting. He also recommended counseling so that Plaintiff could report any myelopathy[7] symptoms. (Tr. 144-47).

On October 31, 2002, Dr. S.W. Casner, M.D. completed an RFC assessment of the Plaintiff based on his medical records. He opined that McKenzie could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk 6 hours in an 8 hour day, sit 6 hours in an 8 hour day, and had unlimited push/pull ability. He found no postural limitations, manipulative limitations, visual limitations, communicative limitations, or environmental limitations. He noted that Plaintiff complained of intermittent lumbar pain that was 3/10, had had lumbar surgery, and had no neurological deficits. He concurred in the finding that McKenzie could engage in light exertion. His notes end with the word "credible." (Tr. 148-55).

McKenzie was seen by Johnny L. Gates, M.D., on three occasions between May 29, 2003 and June 17, 2004. (Tr. 272-76).[8] On October 21, 2003 he presented at the K Clinic, following his involvement in an automobile accident on October 19, 2003. He was seen by Dr. Kim M. Israel, M.D. McKenzie complained of pain and decreased range of motion. The doctor noted a 40% decreased range of motion in his spine and trigger points and that he had decreased "touch" and "strength" in his upper left extremity. (*Id.* at 287). On the same day X-rays of his cervical spine revealed degenerative changes and some straightening of the spine, possibly due to muscle spasm. (*Id.* at 286).

---

[7]Any disease of the spinal cord. *See* Dictionary.com *at* http://dictionary.reference.com/search?q=myelopathy.

[8]Although Plaintiff describes the entries in the doctor's notes (Pl.'s Br. at 5), they are, frankly speaking, illegible.

On October 28, 2003 McKenzie returned to a doctor at the K Clinic. He reported decreased pain and decreased range of motion. (Tr. 285).

On November 17, 2003 the Plaintiff saw Dr Israel at the K Clinic. He was scheduled for an MRI, his prognosis was stated as fair, and he was given a follow-up appointment two weeks from that date. (Tr. 283).

Dr. Israel referred him to David Frank, M.D. for a MRI which was performed on November 20, 2003. Dr. Frank concluded that the Plaintiff had a three millimeter posterior herniation of the nucleus polposus at the C3-4 level with displacement of the right side of the spinal cord; a three millimeter posterior herniation of the nucleus polposus at the C4-5 level with displacement of the right side of the spinal cord; a five millimeter posterior herniation of the nucleus polposus at the C3-4 level with displacement of the right side of the spinal cord, spinal stenosis, and narrowing of the right neural foramen; and a three millimeter posterior bulging of the annulus fibrosis at the C6-7 level with spinal stenosis and narrowing of the neural foramen bilaterally. (Tr. 281-82).

Following receipt of Dr. Frank's report Dr. Israel saw McKenzie on December 2, 2003. Based on his examination of his MRI, he opined that the Plaintiff had cervical HNP, multiple; cervical HNP MRE multiple; left extremity radiculopathy;[9] and cervical spine stenosis. McKenzie was noted to have 20% decreased range of motion and trigger points, as well as decreased "DM," touch, and strength in his left extremity. (Tr. 280).

On December 4, 2003 the Plaintiff reported to the Dallas County Hospital District Outpatient Department where he was seen by Dr. Kim on December 9, 2003. He reported neck

---

[9]"Disease of the spinal nerve roots." Dictionary.com *at* http://dictionary.reference.com/search?q=radiculopathy.

and lower back pain. He was then currently taking muscle relaxants. McKenzie requested a disability evaluation. (Tr. 269).

On December 9, 2003 Dr. Israel at the K Clinic wrote a release report on Plaintiff. He stated that McKenzie had come to his office in connection with injuries sustained in a motor vehicle accident on October 19, 2003. The Plaintiff continued through care until December 2, 2003 when he stated that he was feeling better. Dr. Israel opined that the Plaintiff would be unable to work and would have restricted activities of daily living. (Tr. 278-79).

At the request of Dr. Windsor, Green Diagnostic, Inc. conduced EMI Functional Testing of McKenzie on March 1, 2004. The report stated that his residual functional capacity was below sedentary, and that he lacked the ability to perform his past relevant work. He demonstrated "objective clinical signs and symptoms of a dysfunctional cervical and lumbar spine." He demonstrated weakness during hand grip testing. He had deficits in range of motion and difficulty during cardiovascular testing. The tester opined that the Plaintiff could not lift more than five pounds at a time safely. He had difficulty stooping, crouching, kneeling, bending, repetitive crouching, walking, climbing, standing, sitting, gripping, repetitive hand movements, reaching, reaching above the head, pushing, and pulling. The tester reported that McKenzie cooperated fully in the testing process and demonstrated consistent performance. Observation of the Plaintiff during the testing showed discomfort that would make it difficult for him to perform effectively and comfortably while working. (Tr. 290-300).

On April 10, 2004, the Plaintiff presented at the Parkland emergency department complaining of neck pain and persistent pain and numbness in his left hand. He denied any acute injury. A note on the form indicated that he was homeless. (Tr. 268). He was seen again on April 14, 2004, when he requested medication for his lower back pain. (*Id.* at 267). On

April 15, 2004, his right hand was x-rayed.  No acute fracture or dislocation was seen, although there was a suspected old radial styloid fracture.  (*Id.* at  263).  On the same day he had an x-ray of his cervical spine.  It demonstrated mild multilevel discogenic and facet degenerative changes.  Vertebral body heights were maintained to the bottom of the C7.(*Id.* at 264).  His then current medications were muscle relaxants and pain pills.  (*Id.* at 265).

On April 17, 2004 McKenzie was seen at the Parkland emergency department complaining of pain in his left leg and hand, as well as knee and elbow pain from a fall.  (Tr. 252).  An x-ray of his elbow revealed no acute fracture or dislocation.  (*Id.* at 260).  An x-ray of his left knee revealed no fracture or dislocation, as well as a suprapatellar knee effusion.  (*Id.* at 261).  An x-ray of his left hand revealed no evidence of fracture or dislocation.  (*Id.* at 262).  On April 19, 2004, the Plaintiff was again seen at the Parkland emergency department, complaining of lower back pain.  A note on his form indicates that it was his fourth visit to Parkland in four days.  Plaintiff denied numbness, tingling, or any neurological deficit.  He was told to continue his Naproxen and Flexril and to return to the emergency department as needed.  (*Id.* at 259).

On May 7, 2004 a note in the Parkland records indicated that Plaintiff had been referred by a private physician for an X-ray and MRI and that his then-current medications included ibuprofen, Flexril, Naprosen, and Tramadol. (Tr. 257).

On May 26, 2004 the Plaintiff was seen at the Parkland emergency department for a prescription refill.  It was noted that he had an appointment with the spine clinic on June 19, 2004. It was further noted that he had chronic back and neck pain. (Tr. 256).  On June 12, 2004 McKenzie was seen at Parkland for a cut on his right hand.  It was noted that he was then currently taking muscle relaxants.  (*Id.* at  255).  On June 26, 2004 the Plaintiff was seen at emergency department complaining of right heel pain.  (*Id.* at 253).  On July 1, 2004 the

10

Plaintiff was seen at the Parkland emergency department complaining of stiffness in his right foot and both hands. A note on the hospital form indicated that he was homeless at that time. He was given a muscle relaxant and a pain pill and scheduled with the spine clinic for September 4. (*Id.* at 251).

On July 10, 2004 McKenzie reported to Parkland complaining of lower back pain. (Tr. 250).

On July 26, 2004 the Plaintiff testified on his own behalf at the administrative hearing. He testified that he was 44 years old and had a high school education. He had been living at the Gospel Union Mission, a facility for the homeless, since the previous October. He had suffered an on the job work accident in 2002 which had compounded those injuries that he had sustained in 1997. He reported dizziness when standing and walking, coughing up blood, numbness in his left hand and left leg, an unspecified problem with his right foot, and pain in his neck and lower back. He stated that he took medication for the pain and numbness and that it alleviated the symptoms somewhat. He opined that he could not sit for an hour without pain, could lift approximately 5-10 pounds, and could stand perhaps 10-15 minutes before he became dizzy. (Tr. 331-53).

In his first ground for relief, McKenzie contends that the ALJ's determination of his RFC was not supported by substantial evidence. The ALJ found that McKenzie retained the exertional capacity to perform all of the requirements of light work. (Tr. 16 and 17 ¶ 6). This determination is consistent with the findings of Dr. Van Hal on August 17, 2002 and with those of Dr. Casner on October 31, 2002. Although the ALJ did not expressly describe the weight which he gave to Dr. Van Hal's findings, he expressly concurred in Dr. Casner's finding that the Plaintiff could perform light exertion. (*Id.* at 15). He further found that this finding was not

inconsistent with the conclusions of treating and consulting physicians.  However, one of McKenzie's treating doctors, Dr. Israel, noted that upon his release from the K Clinic, he would be unable to work and have restricted activities.

The only RFC in the record is that performed by Dr. Casner.  (Tr. 148-55).  In determining Plaintiff's disability status the ALJ found that he was able to engage in the full range of light work on the date of his decision.  His reliance on Dr. Casner's assessment cannot be sustained because the assessment was made prior to a third physical injury which occurred on October 19, 2003, almost a year after the assessment was made.  It is equally pertinent to note that Dr. Van Hal observed that McKenzie was at substantial risk for development of problems with his cervical spine with "rather minor trauma such [as] falls or more so with the aspect of a motor vehicle accident."  (*Id.* at 146).  The latter is just such an event on which Dr. Israel's opinion was based.  The magistrate judge agrees with Plaintiff that his treatment at Parkland in April 2004 for numbness and swelling of his left knee, ankle, and hand is irrelevant to a determination of disability.[10]

The ALJ recognized that McKenzie was treated at the K Clinic for injuries in the automobile accident in October 2003.  As noted above he was treated by Dr. Israel.  The only reference to Dr. Israel's treatment in the decision is the fact that he was released from care on December 9, 2003.  However, the cited language omits the further opinion of the doctor in the release notes that McKenzie would be unable to work.  (Tr. 278).  Not only was this observation omitted from the ALJ's findings, but the ALJ failed to address the weight and credibility to be given to Dr. Israel's findings and opinions as a treating physician.  *See* 20 C.F.R. §

---

[10]The ALJ discredited Plaintiff's testimony regarding numbness.  However this condition was reported in the medical records as early as June 28, 2002.  (Tr. 233; *see also* 239, 287, and 280).

404.1527(d)(2).

The ALJ also rejected the report from Green Diagnostic, Inc. as not being supported by the objective medical record; choosing to accept the report of Parkland regarding the x-rays taken on April 17, 2004, which did not relate to all his spinal impairments. Not only is the Green Diagnostic report consistent with Dr. Israel's assessments, it is also consistent with Dr. Van Hal's previous observations with respect to Plaintiff's vulnerability to further severe spinal injuries. In addition it appears that the Green Diagnostic testing was not only detailed, but also in accordance with accepted testing protocols.

Therefore, the decision of the Commissioner is not supported by substantial evidence.

RECOMMENDATION:

For the foregoing reasons it is recommended that Plaintiff's claim be remanded to the Commissioner for further proceedings.

A copy of this recommendation shall be sent to counsel for both parties.

SIGNED this 26th day of August, 2005

*Wm. F. Sanderson Jr.*

Wm. F. Sanderson Jr.
United States Magistrate Judge

NOTICE
In the event that you wish to object to this recommendation, you are hereby notified that you must file your written objections within ten (10) days after being served with a copy of this recommendation. Pursuant to *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(*en banc*), a party's failure to file written objections to these proposed findings of fact and conclusions of law within such ten (10) day period may bar a *de novo* determination by the district judge of any finding of fact and conclusion of law and shall bar such party, except upon grounds of plain error, from attacking on appeal the unobjected to proposed findings of fact and conclusions of law accepted by the district court.